[Crim. No. 871.   Second Appellate District, Division Two.—March 22, 1922.]

In the Matter of the Application of RUDOLPH H. GER-BER for a Writ of Habeas Corpus.

[1] MEDICAL LAW—NATUROPATHY—DEFINITION OF.—Naturopathy is a process or system whereby remedies for disease are discovered and whereby they are applied to the healing of disease.

[2] ID. — PRACTICE OF OPTOMETRY — HOLDER OF INDORSED NATURO-PATHIC CERTIFICATE.—Under the provisions of section 10 of the Optometry Law to the effect that the act shall not be construed to prevent duly licensed physicians and surgeons from treating or fitting glasses to the human eye, the holder of a certificate to practice naturopathy, which has been indorsed by the state board of medical examiners, and whose name is included in the published directory of such board as a person licensed to practice medicine and surgery, is entitled to practice optometry without obtaining a certificate of registration from the State Board of Optometry.

PROCEEDING on Habeas Corpus to secure release for alleged violation of Optometry Law.   Petitioner discharged.

The facts are stated in the opinion of the court.

H. C. Millsap and Millsap & Kendall for Petitioner.

Erwin W. Widney and Schweitzer & Hutton for Respondent.

WORKS, J.—Petitioner demands his release from an alleged unlawful detention pursuant to his conviction upon a charge of having violated that portion of section 1 of the Optometry Law (Stats. 1913, p. 1097) providing that no person shall engage in the practice of optometry without having first obtained a certificate of registration from the State Board of Optometry.  Petitioner does not claim ever to have obtained such a certificate, but he contends that his imprisonment is unlawful because of the provisions of section 10 of the Optometry Law to the effect that the act

2.  Oculists or opticians as within statute regulating practice of medicine, note, 9 Ann. Cas. 203.

shall not be construed "to prevent duly licensed physicians and surgeons from treating or fitting glasses to the human eye." In other words, petitioner makes the claim that he was a duly licensed physician and surgeon at the time of the commission of the acts which were the basis of the charge against him. Whether or not he then was so licensed is the only question presented for our consideration and decision in this proceeding.

Petitioner is a graduate and holds a degree from a school conducted by the Association of Naturopaths of California, which association is a corporation, having been organized in August, 1904. The officers of the association whose duty it is "to pass upon and determine the educational requirements of students" of the school are known as the State Board of Examiners of the Naturopathic Physicians of California. At the time of petitioner's graduation and under date March 17, 1905, this board issued to petitioner a certificate to the effect that he "has passed the required examination in all branches of Naturopathic Therapeutics and that The Board of Examiners herewith in consideration of the applicant's qualification and by the authority vested in us by The State of California confers upon Rudolph H. Gerber the degree of Doctor of Naturopathy with all the privileges, rights and advantages thereunto belonging." This certificate has never been revoked, and petitioner, ever since its date, to quote from his petition in this proceeding, "has continuously engaged within the State of California in the practice of naturopathy, making a specialty of the treatment of the eye."

Counsel for both petitioner and respondent tell us that the word "naturopathy" has never been defined in any dictionary, but notwithstanding that fact we shall experience no great difficulty in determining whether petitioner, in practicing that system, if we may for the moment so designate it, has been following the calling of a physician and surgeon, and also, whether he has been licensed to do so. These questions may be resolved, from the facts we have stated above as a basis, upon the provisions of certain statutes and upon certain practices of the State Board of Medical Examiners, a body the nature and functions of which will be dealt with below. It is to be observed, then, as to the facts, that petitioner is a graduate of a school the destinies of

whose students are under the control of the State Board of
Examiners of the Naturopathic *Physicians* of California,
that upon his graduation this board certified that he had
passed the required examination in all branches of naturo-
pathic *therapeutics*, that they conferred upon him the degree
of *Doctor* of Naturopathy, and that petitioner has since en-
gaged in the *practice* of naturopathy, making a specialty of
the *treatment* of the eye. Webster's definition of thera-
peutics is: "That part of medical science which treats of
the discovery and application of remedies for disease." He
defines the adjectives therapeutic and therapeutical: "Of
or pertaining to the healing art; concerned in discovering
and applying remedies for disease; curative." The same
lexicographer defines treatment as the "Act or manner of
treating; management; handling; usage; as, unkind *treat-
ment;* medical *treatment";* and one of his definitions of the
verb "treat" is, "to care for medicinally or surgically."
This, be it noted, is the only meaning given by him to the
word "treat" which can by any possibility fit the expression
"treatment of the eye." [1] It is not difficult, then, from
the facts given us, and with the aid of Webster, to formulate
the definition that naturopathy is a process or system where-
by remedies for disease are discovered and whereby they are
applied to the healing of disease.

The statutes which we have mentioned, being the medical
practice acts successively passed by the legislature, contain
provisions defining those who shall be regarded as practicing
medicine and surgery, and we now turn to them. The first
of these statutes was passed in 1876. It provides (Stats.
1875–76, p. 792, sec. 11) that "Any person shall be regarded
as practicing medicine, within the meaning of this Act, who
shall profess publicly to be a physician and to prescribe for
the sick, or who shall append to his name the letters 'M. D.' "
This section was amended in 1878 (Stats. 1877–78, p. 918,
sec. 5) to read as follows, in part: "Any person shall be
regarded as practicing medicine, within the meaning of this
Act, who shall profess publicly to be a physician, or who
shall habitually prescribe for the sick, or who shall append
to his name the letters 'M. D.' " The medical practice law
of the state was entirely recast by a statute passed in 1901
(Stats. 1901, p. 56). Section 16 of the act contains the
following: "The following persons shall be deemed as prac-

ticing medicine or surgery within the meaning of this act: 1. Those who profess to be, or hold themselves out as being, engaged as doctors, physicians or surgeons in the treatment of disease, injury or deformity of human beings. 2. Those who, for pecuniary or valuable consideration, shall prescribe medicine, magnetism, or electricity, in the treatment of disease, injury or deformity of human beings. 3. Those who, for pecuniary or valuable consideration, shall employ surgical or medical means or appliances for the treatment of disease, injury or deformity of human beings, except dealers in surgical, dental or optical appliances. 4. Those who, for a pecuniary or valuable consideration, prescribe or use any drug or medicine, appliance, or medical or surgical treatment, or perform any operation for the relief or cure of any bodily injury or disease." The next act concerning the practice of medicine and surgery was passed in 1907, but it contains no definitions upon the subjects covered by our quotations from the earlier statutes. The act of 1907 will be referred to more at large below.

The facts, as we have outlined them above, and the definitions which we have extracted from the statutes, will go far toward settling the question whether petitioner was engaged in practice as a physician and surgeon at the time of the commission of the alleged offense charged against him. The solution of that problem, however, will be effectively aided by a consideration of the question whether he was licensed to practice whatever calling he was engaged in at the time. From this point forward, in fact, the two questions go hand in hand; so much so that they may be said practically to be one.

Two years after petitioner had commenced the practice of his profession under the diploma issued to him by the State Board of Examiners of the Naturopathic Physicians of California the legislature passed the Medical Practice Act of 1907 (Stats. 1907, p. 252). That act contained a certain section 16, the terms of which need not be stated, as we are at present concerned with its provisions as recast by an amendment passed in 1909 (Stats. 1909, p. 418). A part of the section as then amended reads, the italics being ours: "Any person who holds an unrevoked certificate issued by the board of examiners of the Association of Naturopaths of California, incorporated under the laws of the State of Cali-

fornia, August eighth, 1904, and who shall be practicing naturopathy prior to the passage of this act, shall be entitled to practice naturopathy in this state, *the same as if it had been issued under this act.* The board of medical examiners shall endorse said certificate at their first meeting after this act becomes a law, or at any subsequent meeting of the board, but not later than six months after the passage of this act by signature of its president and secretary and affixing its official seal.'' In accordance with the mandate of this provision the State Board of Medical Examiners placed its indorsement on petitioner's naturopathic certificate on April 8, 1909.

The clause of the language last above quoted, to the effect that one situated as was petitioner ''shall be entitled to practice naturopathy in this state, the same as if it [his naturopathic certificate] had been issued under this act,'' at once inspires inquiry as to the effect of certificates issued under the act (of 1907) by the State Board of Medical Examiners. In truth, it will not be amiss to inquire into the nature and functions of that board under all the Medical Practice Acts, for they all provide for such a body and define its powers and duties. Under the act of 1876 (Stats. 1876, p. 792) the board was made up of members of the various incorporated state medical societies. It issued certificates authorizing the holders thereof to practice medicine and surgery in the state. These certificates were of two kinds, those which were to be issued to graduates ''in medicine'' upon the mere production of their diplomas to the board, and those to be issued to persons, not graduates in medicine, who passed examinations conducted by the board. None could practice medicine or surgery without having procured one of these certificates, of either the one form or the other. The act of 1878 (Stats. 1877–78, p. 918) was, as shown by its title, supplemental to and amendatory of the act of 1876. Instead of referring to state medical societies in general, it provided that the board of examiners should be appointed from the Medical Society of the State of California, the Eclectic Medical Society of the State of California, and the California State Homeopathic Medical Society. Otherwise, and so far as the functions of the board are concerned, the terms of the act take no material departure from those of the act of 1876. The Statute of 1901 (Stats. 1901, p. 56)

57 Cal. App.—10

continued the provision that the board should be composed of members of the three medical societies above mentioned. It required that every person, "before practicing medicine or surgery, or any of the departments of medicine or surgery," must have a certificate issued by the board and authorizing him so to practice. This certificate was to be issued, whether the applicant had a diploma from a medical school or not, pursuant to an examination to be conducted by the board, except that the board might in its discretion issue the certificates without examination in the case of applicants holding certificates issued by the examining boards of other states. The act of 1907 (Stats. 1907, p. 252) was in the main similar to the act of 1901. By its terms, however, the Osteopathic Association of California was, together with the medical societies already mentioned, allowed representation on the board of examiners. The act also evidenced this departure from the terms of the earlier statutes: It provided that three forms of certificate should be issued by the board: "first, a certificate authorizing the holder thereof to practice medicine and surgery; second, a certificate authorizing the holder thereof to practice osteopathy; third, a certificate authorizing the holder thereof to practice any other system or mode of treating the sick or afflicted." The earlier statutes had directed alone the issuance of certificates permitting the practice of medicine and surgery. All of these Medical Practice Acts, that is to say, those of 1876, 1878, 1901, and 1907, vest in the board of examiners the power both to refuse and to revoke certificates on account of the unprofessional conduct of applicants for or holders of them. In the last two acts, those of 1901 and 1907, an elaborate machinery is provided for the conduct of hearings before the board pursuant to charges of unprofessional conduct. A written complaint is to be filed, followed by a written citation issued under the seal of the board to the person against whom the charge is preferred. Time is allowed within which to file written answer to the charge and default is to be entered if no answer is presented within the period. Provision is made for the issuance and service of subpoenas to compel the attendance of witnesses, depositions are to be taken, and "the board shall proceed to determine the matter, to that end shall hear such evidence as may be adduced before it," and it may then refuse or grant

certificate, or revoke or refuse to revoke certificate, as the case may require.

If it were not for the language of the act of 1907 to the effect that the examining board may issue certificates in three forms we might here end our quest. Up to the time of the inclusion of that provision in the chain of Medical Practice Acts the functions of the board concerned only the practice of medicine and surgery, which practice, and no other, we are willing to concede for the purposes of this decision, at least, is conducted by those persons known as physicians and surgeons. In the exercise of its duties up to 1907, then, the board of examiners was the sole arbiter of the destinies of physicians and surgeons. No person might take up the practice of medicine or surgery except upon the duly declared consent of the board, and none might continue in that practice in defiance of its mandate, enunciated after a formal and proper investigation pursuant to a charge of unprofessional conduct. Physicians and surgeons could be made only by the board. Short of death or voluntary retirement from practice, they could be unmade only by the board. The legislative direction that such a body should indorse the certificates of practicing naturopaths, contained in section 16 of the act of 1907, as amended in 1909, would be most significant and would practically control the question whether a doctor of naturopathy follows the calling of a physician and surgeon. The significance of the direction does not entirely disappear because of the provision of the act of 1907 for the issuance of certificates in three forms, but it is materially minimized thereby. We therefore take up for consideration a point which involves what we have referred to early in this opinion as certain practices of the State Board of Medical Examiners.

A statute not yet mentioned by us was passed by the legislature in 1901 (Stats. 1901, p. 113) for the purpose of regulating the practice of osteopathy. It provided for a board of five examiners to be composed wholly of osteopaths and to be appointed by the Osteopathic Association of the State of California. That board was to issue certificates allowing the practice of osteopathy, but the act provided that no such certificate should "authorize the holder thereof to prescribe or use drugs, nor to perform major surgery," and that "The system, method and science of treating

diseases of the human body, commonly known as osteopathy, is hereby declared not to be the practice of medicine or surgery, within the meaning'' of the act of 1876, or of any of the acts amendatory thereof. We have already mentioned the fact that the act of 1907 (Stats. 1907, p. 252) allowed the osteopaths representation on the State Board of Medical Examiners, and it is now pertinent to state the extent of that representation,—in fact, to state the manner in which the board was to be made up from the various societies and associations. The body was to be appointed by the Governor and was to consist of eleven members, being the total of ''five members from a list of ten names presented by the Medical Society of the State of California, two members from a list of four names presented by the California State Homeopathic Medical Society, two members from a list of four names presented by the Eclectic Medical Society of the State of California, and two members from a list of four names presented by the Osteopathic Association of the State of California.'' It will be observed that nine-elevenths of the board thus provided for were to be selected from the societies whose members formerly and under all earlier statutes had made up the examining boards which had issued certificates only to physicians and surgeons and whose functions related only to the practice of medicine and surgery. It will be remembered also that the act of 1907 directed the issuance, as one of the three forms of certificates to be issued by the newly constituted board, of certificates authorizing the holders thereof to practice osteopathy. It is evident, then, that the act of 1907 supplanted the act of 1901 legalizing the practice of osteopathy and providing for a board of osteopathic examiners. We now proceed to a consideration of certain provisions of another act to which we have not yet referred (Stats. 1917, p. 93). This statute contains a provision that the State Board of Medical Examiners ''shall, on or before the first day of January of each year, compile and may thereafter publish and sell, a complete directory giving the addresses of all persons within the State of California who hold unrevoked licenses to practice under any medical practice act of the State of California, which license shall in any manner authorize the treatment of human beings for diseases, injuries, deformities, or any other physical or mental conditions,'' and

that "The directory shall contain in addition to the names and addresses of said persons, the names and symbols indicating the title, name or names, school or schools, which such person has attended and from which graduated, the date of issuance of the license, the present residence of said person and a statement of the form of certificate held. The directory shall be *prima facie* evidence of the right of the person or persons named therein to practice." The facts before us do not show whether the directory thus authorized was issued for years prior to 1921 and 1922, but they do show that it was put forth in each of those years. The publication for each of the years mentioned shows first, as to petitioner, the mere entry "Rudolph H. Gerber, Los Angeles." Some pages beyond this entry appears a statement or note in each directory to the effect that certain affixes used therein show the character of the certificates held by the various "physicians," the letter "O" indicating a license to practice osteopathy, and the letter "N" indicating a license to practice naturopathy. This note is followed on a later page in each directory with the entry, "Rudolph H. Gerber, 523 S. Westmore Avenue, Los Angeles (N) April 7, 1909." Each directory contains the following statement, arranged, however, in tabular form: "From August 1, 1901, to August 10, 1913, certificates were issued as follows: To practice medicine and surgery 2233. To practice osteopathy 258. To practice any other system 0." It is to be observed that this tabulation is formulated agreeably to the provision of the Statute of 1907 requiring the examining board to issue certificates in three forms. We are, then, justified in stating the following recapitulation: As petitioner's certificate as a naturopathic physician was both issued to him and indorsed by the medical board between August 1, 1901, and August 10, 1913, he must be represented somewhere in the figures of the tabulation we have just quoted. The use in the directories of the letter "N" after petitioner's name in opposition to the letter "O" demonstrates that the board did not include petitioner among the 258 persons to whom licenses had been issued to practice osteopathy. They therefore did include him among the 2,233 who had been licensed to practice medicine and surgery, for none had been licensed to practice "any other system." Finally, then, we have, in effect, the declaration of the State Board of Medical Exam-

iners that petitioner is among the physicians and surgeons of the state. We need not dwell upon the importance and controlling weight of this declaration, for if our course of reasoning has shown anything it has demonstrated that the examining board is better qualified than any other person or agency in the state, both in fact and by law, to determine whether a given individual be a physician and surgeon, if we except the courts, for with the courts, as a matter of law, must finally rest the solution of such a question. We are satisfied with the conclusion of the Board of Medical Examiners as to the standing of petitioner, not only because it has reached that conclusion, but because of the other matters set forth in this opinion. [2] We conclude that petitioner was a physician and surgeon at the time of the commission of the acts out of which the charge against him grew, that he was entitled to practice optometry under the provisions of section 10 of the Optometry Law, and that, therefore, his detention is unlawful.

Petitioner is discharged from custody.

Finlayson, P. J., and Craig, J., concurred.