## Commonwealth ex rel. Woods v. The Pennsylvania Society of Naturopaths.

*Cyrus E. Woods*, Attorney General, and *Miss S. M. R. O'Hara*, Deputy Attorney General, for plaintiff.

*Edwin M. Abbott* and *Arthur H. Hull*, for defendant.

HARGEST, P. J., October 27, 1930.—This case comes before us upon the suggestion of the Attorney General requiring the defendant to show by what warrant the Naturopathic College, conducted by the Pennsylvania Society of Naturopaths, confers the degrees of doctor of naturopathy, doctor of natural philosophy, and the honorary degree of doctor of natural philosophy. An answer was filed and testimony taken. We have found the facts upon requests by both parties and will restate only those necessary to an understanding of our conclusions.

The defendant society was incorporated on September 22, 1926, by decree of Court of Common Pleas No. 2 of Philadelphia County. Its charter gives it the power, among other things, "to support a college to be known as the 'College of the Naturopathic Society of Pennsylvania' for the teaching of and to give instruction in naturopathy and the use, pursuit and development of such natural science and investigations and practices as may be necessary or required in the equipment and application of that subject; to teach and instruct others in the nature of students in the science of natural methods of healing without the use or practice of surgery or toxic drugs; to have clinics for the instruction and advancement in the practice of naturopathy, and to issue diplomas with the degree of doctor of naturopathy and doctor of natural philosophy to and among those who become proficient in that subject after proper study thereof."

The defendant maintains and operates a school in accordance with its chartered purposes under the name of "College of the Naturopathic Society of Pennsylvania." Defendant conferred, during the years 1928 and 1929, the degrees of "doctor of natural philosophy," "doctor of naturopathy," and the honorary degree of "doctor of natural philosophy." upon a number of persons.

It is contended that the defendant is not an institution authorized by law to confer these degrees. The defendant answers that the degrees are not degrees "in pure and applied science, philosophy or medicine," but are degrees in natural science, natural philosophy, and naturopathy, and that those holding such degrees do not use surgery or toxic drugs in their practice; that defendant is doing only what it is lawfully authorized to do by its charter granted by the Court of Common Pleas of Philadelphia County, and that this court has no jurisdiction to review the authority granted by that court.

1. Does this court have jurisdiction?

The Act of April 7, 1870, P. L. 57, section 1, provides:

"That the court of common pleas of the county of Dauphin is hereby clothed with jurisdiction, throughout the state, for the purpose of hearing and determining all suits, claims and demands whatever, at law and in equity, in which the commonwealth may be the party plaintiff, for accounts, unpaid balances, unpaid liens, taxes, penalties and all other causes of action, real, personal and mixed."

The effect of this act was carefully considered in the case of Com. v. P. S. & N. E. R. R. Co., 2 Dauph. 283, 285, 14 W. N. C. 60, upon a demurrer to a writ of quo warranto. Judge Simonton, after considering the various statutes which had enlarged the jurisdiction of the Court of Common Pleas of Dauphin County, said:

"Such, then, was the old law when the Act of 1870 was passed; and, if the construction contended for on behalf of defendant be correct, no change was effected by its passage, and we must impute to the Legislature the blunder of having passed an Act 'to enlarge the jurisdiction of the Court of Common Pleas of Dauphin County,' which did not enlarge it. This we cannot do if the Act can be fairly construed so as to effect the intent expressed in its title. Was there, then, any mischief to be remedied by this Act, and if so, what? Simply this: That while suits could be brought in the Court of Common Pleas of Dauphin County, by the Commonwealth, against either natural or artificial persons, resident or located in any part of the State, for any pecuniary demand, the Attorney-General might be put to the inconvenience of following the Supreme Court in its peregrinations, or of going into the remote counties of the State, to exercise the prerogative of the Commonwealth to call upon corporations to show their warrant for acts claimed to be usurpations of rights belonging to her alone. Here was a real mischief which, if not remedied by the Act of 1870, still exists; and, as we have already seen, if the Act did not remedy this mischief, it did nothing. But, if the construction contended for by the Commonwealth be correct, the remedy is complete, and all suits and proceedings, in which the Commonwealth is the real plaintiff, can be instituted in the courts of the county in which the seat of government is located, where the official records are kept, and where the chief law officer of the State is required by law to have his office. And, we have no doubt, 'the true reason of the remedy' was, that the convenience of the Commonwealth required that a tribunal should be found, at the seat of government, to which her law officer could resort in all cases in which an appeal to the courts on her behalf should become necessary."

In Mahoney Mutual Assessment Life Ass'n v. Com. ex rel. Attorney General, 14 W. N. C. 370, the supreme court held in construing the Act of 1870:

"The jurisdiction of the court of common pleas of Dauphin County in proceedings to close the business of insurance companies . . . extends to insurance companies located in any county of the Commonwealth."

The court also said:

"This has for ten years been understood to authorize the Attorney General to proceed in this court against an insurance company in any part of the state, and no one has even suggested a doubt as to the legality of such action."

We may add that since the decisions of Judge Simonton and of the Supreme Court in 1883, this court has continued to exercise jurisdiction in mandamus, quo warranto and all other cases in which the Commonwealth is the real party, without serious question.

One of the cases in which the question was raised is that of Com. ex rel. Attorney General v. Millcreek Township School Directors, 30 Dist. R. 474. There a peremptory mandamus was asked against the directors of a school district in the County of Erie, and Judge Henry, specially presiding, sustained the jurisdiction of this court.

It will be noted that the proceeding in this case is not to take away the charter of the defendant, but to question its right to confer the degrees involved. In view of the broad language of the Act of 1870, giving us jurisdiction in "all other causes of action, real, personal and mixed," we see no reason why that language would not include a proceeding by the Commonwealth questioning the right of any corporation to do an ultra vires act. It makes no difference whether the corporation is one of the second class, having a charter granted by the executive department, or whether it is a corporation of the first class, having a charter granted by a court of common pleas. In each instance the charter power emanates from the state. In each instance the Commonwealth is the real party questioning the exercise of corporate rights, and when it does so question them, the proper forum is the Court of Common Pleas of Dauphin County.

We are not persuaded that there is any substance in the argument of the defendant that this position results in an attack upon the decree of another court of coördinate jurisdiction. Be that as it may, if the legislature has seen fit to save the Commonwealth the annoyance of going into other counties of the state by permitting it to go into the county of the seat of government, to question the exercise of powers by one of its corporations, we see no reason why it should be limited to questioning only the corporate powers of corporations of the second class. If a court has improvidently conferred upon a corporation the apparent right to do an ultra vires act, this court, in our opinion, has power, at the suit of the Commonwealth, to consider that question.

2. Is the defendant estopped from now raising the question of jurisdiction?

The Commonwealth contends that the defendant, not having raised the question of jurisdiction in its pleading, cannot now raise it, and cites the Act of March 5, 1925, P. L. 23, as authority for this position. That act provides how jurisdictional questions may be raised and preliminarily determined. Prior thereto the refusal of a court to vacate proceedings for want of jurisdiction was an interlocutory order not appealable. The Act of 1925 permits appeals from orders on purely jurisdictional matters: Wettengel v. Robinson, 288 Pa. 362, 367. If, however, a defendant does not take advantage of the Act of 1925 by appearing only to object to the jurisdiction he cannot obtain an order which is appealable. The question of jurisdiction, then, becomes one of the questions to be determined upon the final hearing of the case: Wilson v. Garland, 287 Pa. 291, 293.

There is nothing in the Act of 1925 to change the rule that the question of jurisdiction may be raised at any time.

3. Is the defendant authorized to confer the degrees in question?

We now consider the nature of the degrees of doctor of naturopathy, doctor of natural philosophy and the honorary degree of doctor of natural philos-

ophy, and whether the college conducted by the defendant is authorized under the law to confer these degrees.

The Act of April 29, 1874, P. L. 73, and its supplements, under which the defendant was incorporated, provides that corporations may be formed for "the support of any literary, medical or scientific undertaking, library association, or the promotion of music, painting or other fine arts." The defendant is incorporated "to support a college to be known as the 'College of the Naturopathic Society of Pennsylvania' for the teaching of and to give instructions in naturopathy . . . to have clinics for the instruction and advancement in the practice of naturopathy and to issue diplomas with the degree of doctor of naturopathy and doctor of philosophy to and upon those who become proficient in that subject after proper study thereof. . . ."

The Act of June 26, 1895, P. L. 327, section 1, provides:

"That all institutions of learning hereafter to be incorporated as colleges, universities or theological seminaries with power to confer degrees in art, pure and applied science, philosophy, literature, law, medicine and theology, or any of them, shall be incorporated in the manner hereinafter set forth. . . ."

The act provides for incorporation by the court of common pleas of the proper county upon proof of publication. Section five provides:

"No charter for such incorporation, with power to confer degrees as aforesaid, shall be granted until the merits of the application, from an educational standpoint, shall be passed upon by a board to be styled 'The College and University Council.'"

Section six provides:

"No institution shall be chartered with the power to confer degrees, unless it has assets amounting to five hundred thousand dollars invested in buildings, apparatus and endowments for the exclusive purposes of promoting instruction, and unless the faculty consists of at least six regular professors who devote all their time to the instruction of its college or university classes. . . ."

The defendant has not complied with these statutory requirements.

The question, therefore, is whether the degrees involved are degrees "in pure and applied science, philosophy or medicine." We find the science or practice of naturopathy to be "the prevention of disease and the treatment of the sick by any movement, manipulation or adjustment performed by the hands or by any instrument or appliances, and the use of any physical forces, such as air, light, heat, water, electricity, or any of their derivatives, or any other system or systems of therapeutics correlated with the above therapeutic measures, the use of non-toxic herbs and plants dispensed, administered and prescribed and minor surgery as a first aid and emergency measure."

The practitioners of naturopathy determine the presence and character of diseases by examination; they treat the disease by manipulation, by the use of water, electricity and non-toxic herbs. They undertake to diagnose and treat persons afflicted with Bright's Disease, rheumatism, neurasthenia, indigestion, disease of the gall bladder and gall duct, pneumonia, renal calculi and others. The practitioners use the title of "doctor" and demand and receive fees for services from the patients.

The defendant contends that the degrees which the college bestows to practice as we have above indicated are not degrees in pure and applied science, philosophy or medicine, but are only degrees in natural science and natural philosophy.

"Philosophy" is defined in the Standard Dictionary to be "the general principles, laws, or causes that furnish the rational explanation of anything; the

rationale by which the facts of any region of knowledge are explained." "Science" is defined to be "any department of knowledge in which the results of investigation have been worked out and systematized; an exact and systematic statement of knowledge concerning some subject or group of subjects, especially a system of ascertained facts and principles governing and attempting to give adequate expression to a great natural group or division of knowledge." To differentiate between pure and applied science on the one hand and the investigation of the great facts of nature which have been reduced to well-defined and established principles and rules on the other is a refinement in which we cannot indulge. The degree of "doctor of natural philosophy" which the defendant claims the right to bestow may be the outcome of an intensive study of the laws of nature, as applied to the human system, including the body and mind. Would that be any less a degree in "pure and applied science" than a degree of "doctor of science" bestowed upon a geologist because of ·study of the formation of the earth's surface? Astronomy and biology are both studies of nature, natural causes and effects, and those studies are undertaken to ascertain scientifically the natural effects which have been produced and the reasons therefor. If degrees based upon the study of astronomy and biology are degrees in applied science, would these degrees which defendant chooses to call degrees in natural science or natural philosophy be any less so, based on the study of the effect of natural forces, electricity, for instance, upon the human body? Yet, if an institution undertook to confer degrees, based upon a study of astronomy or biology, without compliance with the Act of 1895, would it be thought for a moment that they were not degrees in pure and applied science? But we do not have to rely upon this reasoning. We think the courts have already settled the question as to whether the persons holding degrees from the defendant are practicing medicine.

In Medico-Chirurgical Hospital Petition, 190 Pa. 121, 123, the court said:

"We take the word 'medicine' in its common signification, which in the beginning included, and yet, with most of us, includes all the learning having for its object the care of the health and cure of the ills of the human body:" Com. v. Byrd, 64 Pa. Superior Ct. 108.

In Com. v. Seibert, 69 Pa. Superior Ct. 271, 272, Orlady, P. J., said:

"The practice of medicine does not wholly depend upon the administration of drugs. It is a matter of common knowledge that the use of drugs by doctors of medicine has materially decreased during the last decade, and that not infrequently the medical practitioner limits his efforts in relieving disease to the regulation of diet and exercise, or to prescribing changes of scene, climate or environment, and reaches a conclusion as to the needs of his patient through a proper diagnosis that is materially aided by his professional knowledge of disease, its origin, its anatomical and physiological features and causative relations: Swarts v. Siveny, 35 R. I. 1."

In Com. v. Seibert, 262 Pa. 345, 349, Stewart, J., said:

"The distinction that is sought to be made between neuropathy and medicine can avail the defendant nothing if we keep in mind that the legislative meaning of the latter word, when used in the expression 'practice of medicine,' covers and embraces everything that by common understanding is included in the term healing art:" Com. v. Martindell, 82 Pa. Superior Ct. 417, 418.

In Com. v. Jobe, 91 Pa. Superior Ct. 110, 113, Judge Gawthrop said:

"Specialists in, or advocates of, any particular branch or division of medicine or surgery, by whatever newly-coined word it may be known, should know by this time that the declared policy of our laws regulating medicine

and surgery is that no person shall engage in the practice of that profession in the Commonwealth without complying with the statutory requirements as to professional qualifications and that efforts to evade those requirements are engaged in at their peril."

In Com. v. Seibert, supra, the practice of neuropathy, which is "the science of the healing art by which all diseased conditions of the body are restored to health by regulating the blood supply to the involved areas through the nerve mechanism, but exclusively by the physical manipulation around and above the affected parts of the human body" has been held to be the practice of medicine, and in a large number of cases those who have held themselves out as chiropractors have been held to be practicing medicine and surgery. They profess to treat nervous diseases, nerve displacements and nerve impingements by thrust handling and manual treatment and by pressure and heat: Com. v. Byrd, 64 Pa. Superior Ct. 108; Com. v. Martindell, 82 Pa. Superior Ct. 417; Com. v. Jobe, 91 Pa. Superior Ct. 110.

A somewhat extended examination shows that in all the states where the courts have considered the subject, untrammeled by any legislative definitions, the same conclusion has been reached: Com. v. Himmel, 25 Dauph. 449, 454. We find no cases in which naturopathy has been passed upon except in California: Ex parte Gerber, 57 Cal. App. 141, 206 Pac. 1004, and Millsap v. Anderson, 63 Cal. App. 518, 219 Pac. 469. But in these cases it was held that naturopaths were not practicing medicine because there was a legislative definition of the practice of medicine which excluded that system. Naturopaths do all that the chiropractics do and more. It, therefore, follows that the defendant, by conferring degrees authorizing the practice of naturopathy, is, in effect, authorizing the practice of medicine without having complied with the Act of June 26, 1895, P. L. 327. It is acting beyond its lawful powers and must be ousted from such right.

### Decree.

Now, October 27, 1930, it is ordered, adjudged and decreed that the defendant, the Pennsylvania Society of Naturopaths, and the Naturopathic College, conducted by the Pennsylvania Society of Naturopaths in the City of Philadelphia, be and they are hereby ousted and altogether excluded from the power, privilege, right and franchise of granting or conferring degrees of doctor of naturopathy, doctor of natural philosophy, or honorary doctor of natural philosophy, and that the defendant pay the costs of this proceeding.

From Homer L. Kreider, Harrisburg, Pa.